IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 20, 2026

## STATE OF TENNESSEE v. AMORY K. COLLINS

**Appeal from the Criminal Court for Knox County**
No. 126653      Steven W. Sword, Judge

___

### No. E2025-00883-CCA-R3-CD

___

A Knox County jury convicted the Defendant, Amory K. Collins, of one count of burglary and one count of criminal trespass. The trial court merged one count of criminal trespass and the burglary conviction and then sentenced the Defendant to eight years of incarceration. On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction for burglary because there was insufficient proof that he acted knowingly with regard to the underlying theft or attempted theft. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the Court, in which JILL BARTEE AYERS and MATTHEW J. WILSON, JJ., joined.

Dillon Eduardo Zinser, Knoxville, Tennessee, for the appellant, Amory K. Collins.

Jonathan Skrmetti, Attorney General and Reporter; Caroline W. Weldon and Katherine Casseley Redding, Assistant Attorneys General; Charme P. Allen, District Attorney General; and Marissa Pecora and Robert Debusk, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's opening the door to the maintenance shop beneath Neyland Stadium and removing several items from the staff locker room, actions that were captured by security cameras in the stadium. For his actions, the Knox County grand jury indicted the Defendant for two counts of burglary and one count of criminal trespass.

The parties presented the following evidence at trial: Travis Hamlin, an officer with the University of Tennessee Police Department ("UTPD"), was on patrol on St. Patrick's Day, March 17, 2019. Officer Hamlin came into contact with the Defendant that day and, informed the Defendant that he was "criminally trespassed from UT property," meaning that the Defendant was not allowed on any property owned or operated by the University of Tennessee ("UT") unless and until the chief of police rescinded the order. Officer Hamlin explained this thoroughly to the Defendant that evening, and the Defendant said he understood. The State offered a video of the officer's body camera footage from 2019 when he informed the Defendant of his status on the campus of UT.

During cross-examination, Officer Hamlin agreed that in 2019 he was not required to have the Defendant sign a trespass notice, but the department's policy had since changed. He further acknowledged that there was an exception to the trespass if someone had a ticket for a paid event, such as a ballgame.

Tyler Rogers, the assistant foreman with UT Athletics, said his department oversaw the stadium maintenance of UT's outdoor athletic facilities, which included Neyland Stadium. Mr. Rogers went to work on October 27 and 29, 2023, at Neyland Stadium. There was no game that weekend, so they were preparing the facilities for the next week's game. When he left the facility on October 27, 2023, he locked the door. Located inside were the maintenance shop, the turf maintenance office, and a carpentry shop. When he arrived at the facility at 6:55 a.m. on October 29, which was a Sunday, he noted that the door where he entered the stadium was ajar, which was "very odd" because they lock the door every day. The door was being held open by a propane tank. Mr. Rogers heard "rustling about" inside where the offices are located.

Mr. Rogers called his co-worker to notify him of the oddity and then called his supervisor, Tim McHone, who told him to call UTPD. A co-worker Andrew Hobbs arrived, and the two men entered the maintenance area. Mr. Rogers noted that the maintenance area had been "ransacked." He described the scene, saying that there were personal belongings from their locker room and contents of the kitchen cabinets strewn about on the floor, and cabinets were ripped off their hinges in the kitchen. Multiple entrances within the offices had been propped open or left ajar, with a pocketknife holding one of the doors open. From his personal locker there were several items missing, including his credentials to enter NCAA sponsored events and a bottle of cologne. Mr. Rogers noted there were other items missing.

Mr. Rogers contacted Mr. McHone and the other employees and ascertained what was missing. He obtained the surveillance footage to determine what had happened. On

the following Monday, the other employees came in, determined what was missing, and compiled a list for the UTPD of all the items taken.

Mr. Rogers described the maintenance uniforms, saying that UT issued each employee in his division several polo shirts, a backpack, multiple pairs of school-sponsored tennis shoes, a pair of shorts, and either a hoodie or jacket of some sort. Each employee was also issued a credential from the university that displayed the employee's name. His department also had access to seven golf carts, one of which was a John Deere Pro Gator. The keys were primarily hanging on a hook in the office.

Mr. Rogers identified, and the State played for the jury, the surveillance video. The first video was from a camera near Gate 25 of Neyland Stadium. He believed that the time stamp, which showed 4:45 a.m., was accurate. Mr. Rogers did not recognize the man in the video. Mr. Rogers identified a video from outside the maintenance shop doors, near Gate 3 of the stadium. He also identified a video from inside the shop, including the break room, and video showing the same man in the kitchen.

The video was played for the jury and showed the Defendant walking near, but outside a fenced area of the stadium. He gained entry and was seen wearing plain white shoes, jeans, and a dark, short-sleeved shirt. Near him were multiple UT white trucks and equipment. The Defendant appeared unsteady on his feet, entered a hallway under Gate 3, and unsuccessfully attempted to open a door. He tried to open a second door and gained entry. The maintenance shop surveillance video showed a clock with the time 4:55 a.m. The Defendant can be seen near some lockers, from which he took a gray backpack. In a kitchen area near what appeared to be an employee lounge, the Defendant was seen putting a dark hoodie in the backpack. He then put on an orange hat.

The Defendant was in the kitchen area for some time and, when he exited, his backpack was full and he was carrying and eating food. The Defendant went back to the lockers and was holding ID badges. He appeared to take off his shoes, take a shoe box out of a locker, and put on the shoes from the shoe box, as well as an orange hat. The Defendant spent time rummaging through the lockers, opening bins and boxes.

When he left the locker room, the Defendant had a full backpack, a hoodie in his hands, and shoes. He tried to open an interior door using keys he found, but he was unsuccessful. The Defendant propped open a door with a propane tank. When he left, at 6:20, the Defendant was on video carrying two backpacks full of items, many of which still had tags, and wearing different pants, a sweatshirt, and hat than he was wearing when he entered.

3

After viewing the videos, Mr. Rogers recognized the shoes that the Defendant was putting on in the video as belonging to one of the employees. They were orange, black, and gray golf shoes. The man in the video was wearing an orange hat belonging to Christopher Fowler and also had someone's credentials around his neck. In another video, the intruder could also be seen wearing a gray backpack.

During cross-examination, Mr. Rogers agreed that some of the videos had jumps in the timing. During further redirect he explained that the videos were a compilation, or edited version, of the surveillance videos and not the original videos. He had no reason to doubt the authenticity of the videos.

Chris Fowler, with UT Athletics, came into the office the day after these events. He said that everything was thrown about and employees were going through the lockers to discover what was missing. He personally was missing a pair of work gloves and a hat. The maintenance department had provided the work gloves, but he had purchased the hat from the Vol Shop for approximately $36. Mr. Fowler saw the hat on the head of the man who was in the surveillance video from October 29. Mr. Fowler said that their office is never open to the public.

Joshua Glenn Holt worked in the same department for UT Athletics. He came to the office on October 30 to help determine what had been taken. He discovered several things missing: some phone chargers, shirts, and a pair of shoes. The phone chargers he had purchased for himself, and the other items were issued to him as part of his employment.

Mr. Holt identified a picture from the surveillance video that showed the intruder wearing one of the backpacks from his department. He said one was issued to each employee and embroidered with an image unique to their department, specifically it depicted Davy Crockett holding a rifle.

Mr. Fowler agreed that the shop was never open to the public in the three years he had worked there. Mr. Fowler identified photographs of his co-worker's hat, the backpack, and his shoes. Mr. Fowler did not recognize the man depicted in the surveillance videos, and he did not recognize the Defendant.

Two UTPD officers testified about this incident. On October 29, 2023, UT officer Delsean Griffith responded to Neyland Stadium about a break-in of the maintenance office. When he arrived, he and Mr. Rogers went inside the door that had been propped open with a propane tank. The officer confirmed Mr. Rogers's testimony about the condition of the offices. When Officer Griffith reviewed the surveillance videos, he recognized the Defendant, whom he knew to be banned from all UT property.

4

While Officer Griffith was still at the offices, Officer Nikko Ethridge radioed that he was with the Defendant. Both officers were aware of the Defendant's status, and Officer Ethridge had reminded the Defendant of that status on two previous occasions. When Officer Ethridge first encountered the Defendant, he appeared to be sleeping on campus. The officers noted that the Defendant, whom they knew to be homeless, looked as if he had on new clothing and also had a couple of backpacks with him that still had price tags on them. Officer Ethridge noted that the bags appeared to be the kind issued to employees and student athletes. The officer reminded the Defendant that he was not allowed on UT campus.

Officers Griffith and Ethridge arrested the Defendant for criminal trespass and searched him. They found several key access cards, three staff ID cards, all-access passes, and keys, including keys to one of the UT Gator vehicles. Officer Ethridge knew that the trespass order was in effect at the time because it was flagged through dispatch. After the search, Officer Griffith issued a warrant for the Defendant for burglary.

The State offered footage from both officers' body cameras, both with no sound. The footage from Officer Ethridge's body camera showed him approaching the Defendant who appeared to be sleeping on a concrete bench on the edge of campus. The Defendant still had both backpacks and the new clothing. The body camera footage from Officer Griffith showed the Defendant in a black UT sweatshirt. Officer Griffith helped remove one of the backpacks from the Defendant's person and placed him under arrest, patting him down. During the pat down, the officers found multiple sets of keys. The officers placed the Defendant in the back of one of their vehicles and then went through the backpacks and placed their contents into evidence bags. One backpack was gray and embroidered with a picture of Davy Crockett holding a rifle. That backpack contained hats, credentials, and clothing. The other backpack was black and contained what appeared to be a Dewalt power tool.

During cross-examination, Officer Ethridge said that the Defendant was not making sense and seemed confused when the two interacted.

The Defendant testified that on October 28, 2023, he was celebrating his birthday. When he was leaving the bar, he ran into what appeared to be intoxicated college students. A group of four or five of them walked up behind him and bumped into him. The Defendant said he did not recall what happened after.

The Defendant explained that he had been in several accidents previously, including being hit by a car, which affected his memory. He said his condition was called "being

5

punch-drunk or out on your feet. It's like you're awake but you're just going through the motions."

About that morning, the Defendant said he recalled being hungry. A man in the stadium opened the door, and he went in. While unsure, the Defendant indicated that the man may have offered him a hoodie, and he was cold, so he took it. The man then disappeared. The hallway was long and white, and he became disoriented and could not find his way back out. He plugged in a phone to see if it would charge, but it was dead. The Defendant said he did not recall being in the offices for two hours and said he is partially blind, legally blind, and almost deaf.

The Defendant explained that, because he was homeless, he had been asked to move frequently by law enforcement officers, including Officer Griffith. Moving, walking, and standing were difficult for the Defendant given his injuries and the level of pain he suffered, so he was frustrated.

The Defendant agreed that he had a conviction in 2010 for filing a false police report, and a conviction in 2014 for facilitating and manufacturing methamphetamine. He served a prison sentence for each conviction.

The Defendant testified that on the day of his arrest, Officer Ethridge approached him and asked if he was okay. The Defendant said he thought he was off campus and did not know that the "main street" of Cumberland was part of the UT campus. The officer arrested him for criminal trespass.

On cross-examination, the Defendant said that he met the man who let him in the maintenance shop in the back parking lot and the two walked into the side gate, and the man opened the door. The man told him that they were throwing all of the stuff in the area away. He then walked out and closed the door, so the Defendant could not get back out.

Upon further questioning, the Defendant said he was unsure if a man let him in or if the door was just open. He only recalled bits and pieces. He said it was possible he broke the lock, but he did not remember.

The Defendant said that, when first approached by Officer Ethridge, whom he liked, he told him that he got the merchandise after going up some elevators and some hallways. When Officer Griffith, whom he did not like "very much," arrived, he told him a different story. He explained that Officer Griffith immediately offered him his *Miranda* warnings, so he felt this was a different interaction. Officer Griffith also repeatedly asked him if he had been using drugs.

6

Based upon this evidence, the jury convicted the Defendant of one count of burglary and one count of criminal trespass. The trial court sentenced him as a Range III Persistent Offender to eight years of incarceration for the burglary conviction and sentenced the Defendant to thirty days in the county jail for his trespass conviction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support his conviction for burglary because the evidence was insufficient to show that he acted knowingly with regard to the underlying theft or attempted theft. The State counters that there was sufficient evidence to sustain his conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony

of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant was convicted of burglary. As charged in this case, section 39-13-1002(a)(3) of Tennessee Code Annotated specifies that "[a] person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft, or assault[.]" T.C.A. § 39-13-1002(a)(3). Section 39-13-1002(b)(1) defines "enter" as the "intrusion of any part of the body," and section 39-11-106(a)(11) defines "effective consent" as "assent in fact, whether express or apparent." T.C.A. §§ 39-11-106(a)(11), -13-1002(b)(l). Although the statute does not define "assent," Black's Law Dictionary defines it as an "[a]greement, approval, or permission; esp., verbal or nonverbal conduct reasonably interpreted as willingness." BLACK'S LAW DICTIONARY (12th ed. 2024); *see also State v. Sutton*, No. E2024-00792-CCA-R3-CD, 2025 WL 2049552, at *8 (Tenn. Crim. App. July 22, 2025), *no Tenn. R. App. P. 11 application filed.*

"[A] person commits theft of property if the person, with the intent to deprive a merchant of the stated price of merchandise, knowingly commits any of the following acts: (1) Conceals the merchandise; [or] (2) Removes, takes possession of, or causes the removal of merchandise." T.C.A. § 39-14-146(a)(l)-(2), (7).

Here, the State was required to introduce sufficient evidence to allow a rational jury to conclude beyond a reasonable doubt that the Defendant (1) entered UT property; (2)

without UT's effective consent; (3) and committed or attempted to commit theft inside. T.C.A. § 39-13-1002(a)(3). The statute is silent as to the culpable mental state, so "intent, knowledge, or recklessness suffices." T.C.A. § 39-11-301(c).

The Defendant does not dispute that he entered UT or that he committed theft inside. Rather, the Defendant contends there was no evidence to establish that he acted with the requisite mental state because he was "disoriented, confused, and did not have any meaningful recollection" of what occurred. The Defendant presented no evidence of any medical impairment - only his self-serving testimony. Additionally, he testified that he was aware he had been banned from being on the UT campus that day. The jury observed the Defendant's behavior through the surveillance videos and found that the State proved each element of the offense. We decline to reweigh or re-evaluate the evidence. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____*ROBERT W. WEDEMEYER*_____

ROBERT W. WEDEMEYER, PRESIDING JUDGE

9